# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# VALDOSTA DIVISION

| | |
|---|---|
| **OLEO SMITH**, <br><br> *Plaintiff*, <br><br> v. <br><br> **AFFINITY BUILDING SYSTEMS, LLC** <br><br> *Defendant*. | CIVIL ACTION NO. _____ <br><br><br> JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Oleo Smith ("Plaintiff") sets forth this Complaint for Damages against Affinity Building Systems, LLC ("Affinity" or "Defendant") and respectfully shows the Court as follows:

### INTRODUCTION

1. This action is for illegal race-based discrimination and retaliation arising under 42 U.S.C. § 1981 ("Section 1981"). Plaintiff seeks declaratory and injunctive relief, back pay, reinstatement or front pay in lieu of reinstatement, a permanent injunction against future violations, compensatory damages, punitive damages, nominal damages, and all attorney's fees and costs.

1

## JURISDICTION AND VENUE

2. Plaintiff's claims under Section 1981 present federal questions over which the Court has jurisdiction pursuant to 28 U.S.C. § 1331.

3. Venue is proper pursuant to, *inter alia*, 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices alleged below were committed within the geographic boundaries of the Middle District of the United States District Court, Valdosta Division, and within the state of Georgia.

4. This Court has personal jurisdiction over Defendant as they are located within the geographic boundaries of this Court and/or conduct business within the geographic boundaries of this Court.

## PARTIES

5. Plaintiff is a citizen of the United States and a resident of the State of Georgia.

6. Plaintiff was an employee of Defendant at all times material to this Complaint, concluding with his unlawful termination.

7. Plaintiff is an African American and a member of a protected class under Section 1981.

8. Defendant is a company registered to conduct business and transact business in the state of Georgia.

9. Defendant may be served with process through its registered agent if formal service of process is not waived.

> Registered Agent Name: **Minick, Julie**
> Physical Address: **62 Murray Blvd, Lakeland, GA, 31635, USA**
> County: **Lanier**

10. Upon information and belief, Defendant employed more than fifteen (15) employees during each working day of at least twenty (20) calendar weeks in the relevant period.

11. Defendant is subject to the anti-discrimination provisions of Section 1981.

## STATEMENT OF FACTS

## RACIAL DISCRIMINATION ALLEGATIONS

12. Plaintiff's race is African American.

13. Plaintiff began his employment with Defendant on or about December 16, 2021 as a roofer.

14. For the first 2 years of his employment, Plaintiff performed well and was cross-trained through several departments, often being asked to take on training duties.

15. Plaintiff's supervisor was Enrique Mosquera ("Mr. Mosquera").

16. Early in Plaintiff's employment, Mr. Mosquera began discriminating against Plaintiff because of his race, both by creating a hostile work environment and treating Plaintiff in a disparate manner compared to non-African American employees.

17. For example, Mr. Mosquera would assign Plaintiff the most difficult tasks.

18. Further, Mr. Mosquera often made comments about Black workers being lazy and sorry and expressed disdain for Black employees.

19. At the time, Plaintiff voiced concerns about Mr. Mosquera's treatment of Black employees directly to Mr. Mosquera.

20. In or about December 2022, after one year of employment, Plaintiff was supposed to receive a raise because he exceeded the performance metrics for his annual evaluation and asked Mr. Mosquera about his salary increase.

21. Plaintiff was then subjected to an additional 30-day probationary period that other employees were not subjected to, with Mr. Mosquera stating that Plaintiff had to demonstrate his value to Mr. Mosquera personally.

22. Further, other employees with less experience than Plaintiff received raises, and no other employees were required to meet any additional probationary requirements before receiving a raise.

23. In or around January 2023, Mr. Mosquera moved Plaintiff to the Walls department with no explanation.

24. During his six months in Walls, Plaintiff again performed well and took on training responsibilities.

25. During this period, Plaintiff again approached Mr. Mosquera about his raise eligibility, to which Mr. Mosquera replied, "You don't need a raise. You have a nice car, gold teeth, a gold chain."

26. Mr. Mosquera also mocked Plaintiff's physical mannerisms in a manner intended to belittle him publicly, which contributed to a hostile work environment.

27. Despite his excellent performance and high scores, Plaintiff was again denied a raise by Mr. Mosquera.

28. In or around July 2023, Plaintiff was again reassigned by Mr. Mosquera to the Siding department.

29. Plaintiff then escalated his concerns about Mr. Mosquera's racially discriminatory behavior to the Plant Manager, who dismissed Plaintiff's concerns because of Mr. Mosquera's "authority."

30. In or around November 2023, after performing well in the Siding department, Plaintiff was told by the Plant Manager that he was being trained for promotion to the Utility Team, despite Mr. Mosquera's opposition to the decision.

31. The Utility Team was designed to fill in areas that were behind or shorthanded and was staffed by skilled employees that were cross-trained in multiple areas to fill those needs.

32. The fact that Plaintiff was promoted to the Utility team shows that his performance was excellent in several departments and that he had high assessment scores.

33. Shortly after Plaintiff's promotion to the Utility Team, the promoting manager retired, and Mr. Mosquera assumed his role.

34. Over the next few months, despite being on the Utility Team, Mr. Mosquera excluded Plaintiff from tasks and communications; refused to issue Plaintiff a team radio; and denied Plaintiff access to team meetings.

35. In fact, when Plaintiff attempted to join Utility Team meetings, he was told to leave.

36. Additionally, Mr. Mosquera refused to rotate Plaintiff through departments as the normal procedure for Utility Team members, despite other departments being short-staffed or experiencing delays.

37. When Plaintiff asked Mr. Mosquera about the rationale behind his exclusion from departmental transfers, he was told simply, "If you don't like it, you can leave."

38. Plaintiff continued to be denied access to Utility Team radio access and communication tools.

39. In early June 2024, Plaintiff was confronted by Mr. Mosquera while Plaintiff was actively performing his job duties, accusing Plaintiff of "walking around and never working," despite the fact that the job required Plaintiff to move around.

40. During this confrontation, Mr. Mosquera referred to Plaintiff using the derogatory term "n*gger."

41. On or about June 7, 2024, Plaintiff reported the interaction to Mary Viehman ("Ms. Viehman") in Human Resources, and was instructed to provide a written statement and information about witnesses to the interaction.

42. Plaintiff went out on approved PTO before he had a chance to complete his statement and fully intended on providing the requested statement upon his return to work.

43. In fact, Plaintiff also informed HR that he would provide a statement and additional corroborating statements from witnesses.

7

44. However, while Plaintiff was on vacation, he learned that he was on a layoff list.

45. Plaintiff called Defendant on June 17, 2024, while out on PTO and was informed by Mr. Mosquera that he was being laid off (before he had a chance to complete his statement about Mr. Mosquera and return it to Ms. Viehman).

46. Mr. Mosquera told Plaintiff that he was being laid off because of lack of sufficient work, an explanation that Plaintiff believed to be frankly ludicrous due to the delays and short-staffed nature of several departments.

47. Additionally, Plaintiff confirmed with Dewayne Wood, an Assistant Plant Manager, that Mr. Mosquera was the manager who made the recommendation to terminate Plaintiff.

48. Plaintiff was the only African American employee from the Utility team that was laid off despite his excellent performance record.

49. Further, this occurred only 11 days after his complaint to HR about Mr. Mosquera's continued racial discrimination and use of a racial slur, which is undeniable temporal proximity to Plaintiff's protected complaints.

50. Plaintiff believes the reason given for his termination was pretextual and that he was actually fired for his protected complaints of racial discrimination.

## COUNT I
## RACE DISCRIMINATION IN VIOLATION OF SECTION 1981

51. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

52. Plaintiff is a member of a protected class (African American).

53. Plaintiff was employed by Defendant at all times material to this Complaint.

54. Plaintiff was qualified for the position he held.

55. Plaintiff was subjected to race discrimination as described above.

56. Defendant willfully and wantonly disregarded Plaintiff's rights and Defendant's discrimination against Plaintiff was undertaken in bad faith.

57. Defendant failed to take prompt and appropriate remedial measures to stop or cure the aforementioned discrimination.

58. As a direct and proximate result of Defendant's unlawful discriminatory actions, Plaintiff has suffered lost wages and other benefits of employment, significantly diminished employment opportunities, inconvenience, loss of income, and emotional distress, including but not limited to outrage, shock, and humiliation.

## COUNT II
## RETALIATION IN VIOLATION OF SECTION 1981

59. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

60. Plaintiff engaged in activities protected under Section 1981 by making repeated complaints of race-based discrimination as detailed above.

61. After Plaintiff's complaints of Defendant's conduct prohibited, Plaintiff was terminated.

62. As a direct and proximate result of Defendant's unlawful discriminatory and retaliatory actions, Plaintiff has suffered lost wages and other benefits of employment, significantly diminished employment opportunities, inconvenience, loss of income, and emotional distress, including but not limited to outrage, shock, and humiliation.

**WHEREFORE**, Plaintiff demands a trial by jury and for the following relief:

(a) That Summons issue;

(b) That Defendant be served with the Summons and Complaint;

(c) Full back pay from the date of Plaintiff's termination, taking into account all raises to which Plaintiff would have been entitled but for the unlawful termination, and all fringe and pension benefits of employment, with prejudgment interest thereon;

(d) Reinstatement to Plaintiff's former position with Defendant, or in the alternative, front pay to compensate Plaintiff for lost future wages, benefits, and/or pensions;

(e) Compensatory damages, in an amount to be determined by the enlightened conscience of the jury, for Plaintiff's emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, and special damages;

(f) Punitive damages in an amount to be determined by the enlightened conscience of the jury to be sufficient to punish Defendant for their conduct toward Plaintiff and deter Defendant from similar conduct in the future;

(g) Reasonable attorney's fees and costs;

(h) Judgment against Defendant for damages incurred by Plaintiff;

(i) Judgment against Defendant in such an amount as will fully and adequately compensate Plaintiff; and

(j) Other and further relief as the Court deems just and proper.

Respectfully submitted this 11th day of September, 2025.

> /s/ J. Stephen Mixon
> J. Stephen Mixon
> Georgia Bar No. 514050
> steve@mixon-law.com
> Attorney for Plaintiff

THE MIXON LAW FIRM
3344 Peachtree Rd. Suite 800
Atlanta, GA 30326
Telephone: (770) 955-0100